# EXHIBIT 3

# DEPOSITORY AGREEMENT

between

**JUEGOS DE GUADALUPE, S. de R. L. de C.V.,**
as Juegos de Guadalupe,

and

**LVD HOLDINGS MEXICO, LLC,**
as LVDHM,

Dated as of August 25, 2006

# DEPOSITORY AGREEMENT

THIS DEPOSITORY AGREEMENT, dated as of August 25, 2006 (the "Depositary Agreement"), between LVDHM Holdings Mexico("LVDHMHM"), a Limited Liability Corporation organized under the laws of the Lac Vieux Desert Band of Lake Superior Chippewa Indians, and Juegos de Entretenimiento y Videos de Guadalupe, ("Juegos de Guadalupe") a S. de R. L. de. C. V. organized under the laws of Mexico.

## RECITALS

A.  LVDHM and Juegos de Guadalupe are parties to that certain Partnership Purchase Agreement dated as of August 25, 2006, pursuant to which Juegos de Guagalupe has agreed to make certain Cash Flow Participation payments to LVDHM.

B.  In order to give effect to the Partnership Purchase Agreement and other Transaction Documents executed between by Juegos de Guadalupe and LVDHM, a Revenues Account shall be established for the deposit and payment of all amounts due to LVDHM. Such funds shall be deposited by Juegos de Guadalupe's under its obligations provided by the Partnership Purchase Agreement and the other Transaction Documents.

NOW, THEREFORE, in consideration of the mutual agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto do hereby agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.1  *Defined Terms*. Except as otherwise expressly provided herein, capitalized terms used herein which are defined in the Credit Agreement shall have the same meanings herein as therein. As used herein, the following terms shall have the following meanings:

"*60 day reserve*" means the Gross Daily Profit generated by Juegos de Guadalupe for the first 60 days of operations to the general public, which shall be used to fund Casino Operations.

"*Cash Flow Participation*" means twenty-six percent (26%) of the Gross Daily profit of the Casino, which LVDHM is entitled to resulting from its purchase of twenty-six percent (26%) of the value of the partnership of Juegos de Guadalupe, which shall become due and payable as of the 61st Day of Casino operations.

"*Casino*" means the video gaming and sports book facilities not including of "Online Gaming" in Guadalupe, Nuevo León Mexico, operated by the "A en P" formed by Juegos de Guadalupe and E-Mex, and conducted pursuant to the E-Mex Permit.

"*Casino Assets*" means any and all now owned or hereafter acquired Property that is associated with the current and future Casino Operations including, without limitation, the Pledged Revenues and all tangible Property utilized in connection with the Casino Operations; provided that the Joint Venture may construct facilities adjacent and ancillary to the Casino, which, provided such ancillary facilities do not adversely impact the Net Income from the Casino, shall not be considered as "Casino Assets." This definition is only related to Juegos de Guadalupe, and in no case shall affect, include any other operation, current or future in which E-MEX is a member.

"*Casino Operations*" means the existing and future gaming, entertainment, lodging, food and beverage, retail and other operations conducted by the Casino.

"*Collateral*" means twenty-six percent (26%) of the shares of GRH currently held or controlled by Arturo Rojas Cardona, held either by Arturo Rojas Cardona as an individual or through ATLICO.

"*Daily report*" means reports generated automatically by the system, which will be sent to all members of Juegos de Guadalupe. It is a report for a 24hr period of gaming, from 7.01 am to 7.00 am next day, this report is to be accessible at any giving moment online

"*Event of Default*" means any event described in Section 6.1.

"*First Gaming Day*" means the first day the casino operation is open to the general public.

"*Gross Daily Profit*" means Total Cash Banking revenues during a twenty-four (24) hour period, minus (a) total redemptions or prizes paid out, (b) an amount reasonably necessary to pay applicable taxes, and (c) the Operating Reserve.

"*Gross Daily Profit Account*" means the account established by Juegos de Guadalupe, wherein Gross Daily Profits are deposited or held, and from which the Cash Flow Participation of LVDHM is paid.

"*Lien*" means any lien (statutory or other), mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including, without limitation, the interest of a vendor or lessor under any conditional sale, Capitalized lease, or other title retention agreement.

"*Monthly Service Charges*" means the amount required to be paid in the applicable month for interest on, servicing fees with respect to, amortization of, and the establishment or maintenance of required reserves for, such Cash Flow Participation.

"*Notice of Default*" means the notification made by LVDHM to Mexican Counterparts thru Certified mail or International Courier in which it states the cause of event of default by Juegos de Guadalupe

2

"*Operating Expenses*" means without duplication, expenses of the operation of the casino, determined in accordance with GAAP, consistently applied, including but not limited to the following: (a) the payment of compensation for all employees working at the Casino; (b) materials and supplies for the Casino; (c) utilities; (d) repairs and maintenance of the Casino (excluding Capital Expenditures); (g) insurance and bonding; (h) advertising and marketing, including busing and transportation of patrons to the Facility; (i) the cost of Promotional Allowances; (j) accounting, legal and other professional fees; (k) security costs; (m) trash removal; (n) costs of goods and services sold at the Casino; (o) recruiting and training expenses; (p) software licensing fee of $1.75 per machine per day; (q) equipment monthly payments. Operating Expenses shall not include any management fees or any principal due and owing on debt of the Casino. The established current Operating Expenses are fixed at 20% of the gross revenues of the Casino, amendments to this percentages shall be recognized by the parties if current conditions like the following examples but not limited to them: Increase in wages, increase of the Gaming tax to be paid to the Mexican Federal Government, software licensing, acquisition of new equipment etc.

"*Operational Reserve*" means 20% of the Total Cash Banking, which shall be deducted to fund all Operating Expenses.

"*Pledge Agreement*" means an agreement to be executed by Juegos de Guadalupe, GRH and LVDHM to serve as Collateral. This Agreement shall be governed under Mexican Law.

"*Pledged Revenue Account*" means the account established by LVDHM, wherein the Cash Flow Participation shall be deposited according to the requirements of Section 2.3 of this Agreement.

"*Transaction Documents*" refers to this agreement, the Depository Agreement, the Partnership Purchase Agreement, and the Operational Agreement.

"*Total Cash Banking*" means all gross revenue received by Juegos de Guadalupe per location per day, including all receipts, revenues, and rents from casino assets, including, without limitation, from (1) casino operations (including from gaming, food and beverage operations and other concessions), (2) the lease or sublease of space or equipment constituting casino assets, (3) the disposition of, or insurance proceeds relating to, all or any portion of any Casino assets, and (4) any other activities carried on within the Casino operations.

## ARTICLE II

## SECURITY INTEREST; TRANSFERS BY COLLECTION BANKS; NOTICES TO DEPOSITORY

Section 2.1   Revenue.

(a)   Juegos de Guadalupe hereby assign and transfer to LVDHM and grant to LVDHM twenty-six percent (26%) of the Gross Daily Profit of the Casino ("Revenue").

3

All monies, cash equivalents, instruments and securities at any time on deposit in any of the Revenues Account shall constitute LVDHM's Cash Flow Participation, for the purchase of twenty-six percent (26%) of the shares of Juegos de Guadalupe, and shall at all time be subject to the control of LVDHM as the entitlement holder in respect of the Revenue Account. Upon the occurrence and during the continuance of an Event of Default, LVDHM shall have all rights and powers to which its entitled according to Transaction Documents in respect to the Collateral.

(b)     Juegos de Guadalupe agrees that from time to time it shall promptly execute and deliver all instruments and documents, and take all actions, that may be reasonably necessary, or that LVDHM may reasonably request, in order to perfect and protect the Cash Flow Participation, or to enable LDHM to exercise and enforce its rights and remedies hereunder with respect to the Revenue Account, all financial assets held therein or credited thereto and all proceeds thereof.

Section 2.2     Creation of Accounts.

LVDHM hereby agrees to establish under its name and control, on or prior to the Effective Date, an open banking account to be titled as the Pledged Revenue Account, in which daily Juegos de Guadalupe will deposit LVDHM's Cash Flow Participation.

Section 2.3     Transfers.

(a)     Commencing on the Effective Date until the Completion Date, twenty-six percent (26%) of the Gross Daily Profit shall be deposited into the Gross Daily Profit Account. Juegos de Guadalupe shall, at its own expense, cause all Cash Flow Participation to be deducted from the Gross Daily Profit Account and deposited in the LVDHM Pledged Revenue Account within 24 hours of the availability of the Daily Report.

(b)     In the event that Juegos de Guadalupe retains any amount that should have been deposited in the Pledged Revenue Account, Juegos de Guadalupe agrees that it will hold such amounts in trust for the benefit of LVDHM.

(c)     Any deposit made to the Pledged Revenue Account under this Agreement shall be irrevocable and the amount of such deposit and any instrument or security held in such Account.

## ARTICLE III

## DEFAULT

Section 3.1     Events of Default. Each of the following occurrences shall constitute an Event of Default:

(a)     Any representation or warranty made by or on behalf of Juegos de Guadalupe herein or in any report, certificate or other document furnished by or on behalf

4

of Juegos de Guadalupe pursuant to this Agreement shall prove to be false or misleading in any material respect.

(b) Juegos de Guadalupe shall fail to pay LVDHM any Revenues at the time and in the manner required by Section 2.3.

(c) Juegos de Guadalupe shall default in the due observance or performance of any of its other obligations hereunder.

(d) A default or event of default, however designated, shall occur under any other Transaction Document.

Section 3.2   Remedies on Default. Whenever an Event of Default shall have occurred and be continuing, LVDHM shall notify Juegos de Guadalupe and its Board of Directors that an Event of Default has occurred hereunder and shall be entitled to exercise all of the rights and remedies available under applicable law, and all rights and remedies available to it under this Agreement, including, without limitation, the right, from time to time, without demand or notice of any kind, to:

(i) appropriate any and all Cash Flow Participation and proceeds thereof in accordance with the Transaction Documents;

(ii) demand, collect, receive and receipt for the Gross Daily Profit;

(iii) compromise, settle, prosecute and discontinue any suits or proceedings in respect of any or all of the Gross Daily Revenues;

(iv) without notice, demand or legal process, enter upon any premises of Juegos de Guadalupe and examine, copy or make extracts from, any and all books, records and documents in Juegos de Guadalupe's possession or control relating to the Pledged Revenues or any of the representations or covenants of Juegos de Guadalupe hereunder; and

(vi) exercise any and all other rights, remedies and privileges it may have under this Agreement, the Security Agreement, the other Transaction Documents or applicable law.

Any proceeds of the exercise of any remedy by LVDHM hereunder shall be applied (i) first to the payment by of all reasonable fees and expenses of LVDHM then due and payable, including expenses of the exercise of such remedies, including the reasonable attorneys' fees and legal expenses incurred in connection therewith by LVDHM, (ii) second, transferred to the Gross Daily Profit, and (iii) third, any surplus after such application shall be delivered to Juegos de Guadalupe, except as otherwise required by law or as a court of competent jurisdiction may direct.

Section 3.3   Waivers; Remedies. Any waiver given by LVDHM hereunder shall be effective only in the specific instance and for the specific purpose given. Mere delay or failure to act shall not preclude the exercise or enforcement of any rights and remedies available to

5

LVDHM. All rights and remedies of LVDHM shall be cumulative and may be exercised singly in any order or concurrently, at LVDHM's option, and the exercise or enforcement of any such right or remedy shall neither be a condition to nor a bar to the exercise or enforcement of any other.

## ARTICLE IV
## MISCELLANEOUS

Section 4.1   Taxes. Both parties agree to pay their own taxes that may be payable with respect to the execution or delivery of this Agreement, which obligation shall survive the termination of this Agreement; provided, however, that the Gaming Tax payable to the Mexican Federal Authorities shall be paid by Juegos de Guadalupe.

Section 4.2   Governing Law. This Agreement shall be construed in accordance with and governed by the laws of the State of Arizona.

Section 4.3   Severability. If any provision of this Agreement is prohibited by, or is unlawful or unenforceable under, any applicable law of any jurisdiction, such provision shall, as to such jurisdiction, be ineffective to the extent of such prohibition without invalidating the remaining provisions hereof; provided, however that where the provisions of any such applicable law may be waived, they hereby are waived by Juegos de Guadalupe to the fullest extent permitted by law to the end that this Agreement shall be deemed to be a valid and binding agreement in accordance with its terms.

Section 4.4   Survival. The warranties, representations, covenants and agreements set forth herein shall survive the execution and delivery of this Agreement and shall continue in full force and effect until all Secured Obligations shall have been paid in full.

Section 4.5   Notices. Any notice to any party to this Agreement shall be in writing and shall be sent by manual delivery, certified mail or international courier, addressed to such party at the address specified on the signature page hereof, or at such other address as such party shall have specified to the other parties hereto in writing.

Section 4.6   Captions. Captions herein are for convenience only and shall not be deemed part of this Agreement.

Section 4.7   Binding Effect. This Agreement shall be binding upon and inure to the benefit of Juegos de Guadalupe, LVDHM and their respective successors and assigns.

Section 4.8   Amendments. This Agreement may not be amended, modified, waived, canceled or terminated, except in writing executed by LVDHM and Juegos de Guadalupe.

Section 4.9   Entire Agreement. This Agreement constitutes the entire understanding of Juegos de Guadalupe and LVDHM with respect to the subject matter addressed.

Section 4.10   <u>Confidentiality</u>. Parties agrees to use all reasonable precautions to keep the information provided hereunder confidential in accordance with its customary procedures for the treatment of any confidential financial information.

Section 4.11   <u>Counterparts</u>. This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original but all of which when taken together shall constitute a single contract.

[Remainder of this page intentionally left blank]



7

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

JUEGOS DE ENTRETENIMIENTO Y VIDEOS DE GUADALUPE, S. de. R. L. de C. V.

By: _____
Name:
Title:

Calzada del Valle #234 Col. Del Valle, San Pedro Garza Garcia Nuevo Leon Mexico. C.P. 66220

LVD HOLDINGS MEXICO, LLC

By: _____
Name:
Title: [Managing Member]

P.O. Box 249 Choate Road, Watersmeet, Michigan. USA 49969

B-1

# EXHIBIT 4

# SECURITY AGREEMENT

This **SECURITY AGREEMENT** (the "Agreement"), is dated as of August 1_, 2006, between the Juegos de Entretenimiento y Videos de Guadalupe, S. de R.L. de C.V. ("Juegos de Guadalupe"), Atlantica de Inversiones Corporativas, S.A. ("ATLICO"); Guadalupe Recreation Holdings; L.L.C. ("GRH"), Arturo Rojas Cardona, an individual, and **LVD HOLDINGS MEXICO, LLC** ("LVDHM") with an address of P.O. Box 249 Choate Road, Watersmeet, Michigan 49969.

## WITNESSETH:

WHEREAS, LVD Holdings Mexico, LLC, executed a Subscription Agreement to purchase a partnership of 26,000 units from the social capital Juegos de Entretenimiento y Videos de Guadalupe, S. de R.L. de C.V., with a value of US$6,500,000 (SIX MILLION FIVE HUNDRED THOUSAND American Dollars CY); and

WHEREAS, Juegos de Guadalupe is a subsidiary of GRH, with participation of Arturo Cardona Rojas; and

WHEREAS, Arturo Cardona Rojas is the Sole Administrator of Juegos de Guadalupe; and

WHEREAS, ATLICO, a Panama-registered company, holds 77,500 Class "A" Units in GRH; and

WHEREAS, Arturo Rojas Cardona is the Co-Manager of GRH and is the owner of ATLICO; and

WHEREAS, ATLICO held beneficial ownership of Juegos de Guadalupe; and

WHEREAS, Arturo Rojas Cardona retained a 1% interest in Juegos de Guadalupe and joined with its nominees in transferring the remaining 99% interest in Juegos de Guadalupe to the GRH in exchange for 40,000 Class "A" Units; and

WHEREAS, E-Mex holds Permit DGAJS/SCEVF/P and its amendments granted by the Mexican Ministry of Interior (Secretaria de Gobernacion) ("SEGOB") to conduct gaming and several related services in Mexico; and

WHEREAS, Arturo Rojas Cardona is one of the shareholders and is the President of the Board of Directors of E-Mex; and

WHEREAS, Juegos de Guadalupe and E-Mex have formed a Joint Venture Agreement in the form of Asociación en Participación ("A en P") pursuant to which Juegos de Guadalupe intends to operate video gaming and sports book facilities in the county of Guadalupe, Nuevo León, Mexico pursuant to the E-Mex Permit; and

WHEREAS, Arturo Rojas Cardona, as a Sole Administrator of Juegos de Guadalupe and President of the Board of Directors of EMex, has entered into the Joint Venture Agreement between the two companies;

WHEREAS, it is a condition precedent to LVDHM making any investments under the Subscription Agreement that Mexican Counterparts execute and deliver to LVDHM a security agreement in substantially the form hereof; and

WHEREAS, Juegos de Guadalupe and Arturo Rojas Cardona together wish to grant a security interest in favor of LVDHM.

NOW, THEREFORE, in consideration of the promises contained in this document and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. **Definitions.** All capitalized terms used in this document without definitions will have the respective meanings provided for in the Transaction Documents.

*"60 day reserve"* means the Gross Daily Profit generated by Juegos de Guadalupe for the first 60 days of operations to the general public, which shall be used to fund Casino Operations.

*"Cash Flow Participation"* means twenty-six percent (26%) of the Gross Daily profit of the Casino, which LVD is entitled to resulting from its purchase of twenty-six percent (26%) of the Partnership Interest of Juegos de Guadalupe, which shall become due and payable as of the 61st Day of Casino operations.

*"Casino"* means the video gaming and sports book facilities not including of "Online Gaming" in Guadalupe, Nuevo León Mexico, operated by the "A en P" formed by Juegos de Guadalupe and E-Mex, and conducted pursuant to the E-Mex Permit.

*"Casino Assets"* means any and all now owned or hereafter acquired Property that is associated with the present and future Casino Operations including, without limitation, the Pledged Revenues and all tangible Property utilized in connection with the Casino Operations; provided that the Joint Venture may construct facilities adjacent and ancillary to the Casino, which, provided such ancillary facilities do not adversely impact the Net Income from the Casino, shall not be considered as "Casino Assets." This definition is only related to Juegos de Guadalupe, and in no case shall affect, include any other operation, current or future in which E-MEX is a member.

*"Casino Operations"* means the existing and future gaming, entertainment, lodging, food and beverage, retail and other operations conducted by the Casino.

*"Collateral"* means twenty-six percent (26%) of the Partnership Interest of GRH currently held or controlled by Arturo Rojas Cardona, held either by Arturo Rojas Cardona as an individual or through ATLICO.

Page 2 of 8

"*Daily report*" means those reports that are regularly and automatically generated by the casino operator during a twenty-four (24) hour period. Such reports shall be sent by email to all shareholders of Juegos de Guadalupe, and shall also be made available to all shareholders online.

"*Day 61*" means the first day that the Gross Daily Profit is to be divided between shareholders of Juegos de Guadalupe.

"*First Gaming day*" means the first day the casino operation is open to the general public.

"*Gross Daily Profit*" means Total Cash Banking revenues during a twenty-four (24) hour period, minus (a) total redemptions or prizes paid out, (b) an amount reasonably necessary to pay applicable taxes, and (c) the Operating Reserve.

"*Lien*" means any lien (statutory or other), mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including, without limitation, the interest of a vendor or lessor under any conditional sale, Capitalized lease, or other title retention agreement.

"*Mexican Counterparts*" means (a) Entretenimiento de Mexico, S.A. de C.V. (b) Guadalupe Recreation Holdings, LLC, (c) Atlantica de Inversiones Corporativas, S.A. (d) Juegos de Entretenimiento y Video de Guadalupe, S. de R. L. de C. V. (e) the "Asociacion en Participacion" created by Entretenimiento de Mexico, S.A. de C.V. and Juegos de Entretenimiento y Video de Guadalupe, S. de R. L. de C. V. and (f) Arturo Rojas Cardona.

"*Notice of Default*" means the notification made by LVDHM to Mexican Counterparts thru Certified mail or International Courier in which it states the cause of event of default by Juegos de Guadalupe.

"*Operating Expenses*" means without duplication, expenses of the operation of the casino, determined in accordance with GAAP, consistently applied, including but not limited to the following: (a) the payment of compensation for all employees working at the Casino; (b) materials and supplies for the Casino; (c) utilities; (d) repairs and maintenance of the Casino (excluding Capital Expenditures); (g) insurance and bonding; (h) advertising and marketing, including busing and transportation of patrons to the Facility; (i) the cost of Promotional Allowances; (j) accounting, legal and other professional fees; (k) security costs; (m) trash removal; (n) costs of goods and services sold at the Casino; (o) recruiting and training expenses; (p) software licensing fee of $1.75 per machine per day; (q) equipment monthly payments. Operating Expenses shall not include any management fees or any principal due and owing on debt of the Casino. The established current Operating Expenses are fixed at 20% of the gross revenues of the Casino, amendments to this percentages shall be recognized by the parties If current conditions like the following examples but not limited to them: Increase in wages, increase of the Gaming tax to be paid to the Mexican Federal Government, software licensing, acquisition of new equipment etc.

"*Operational Reserve*" means 20% of the Total Cash Banking, which shall be deducted to fund all Operating Expenses.

"*Pledge Agreement*" means an agreement to be executed by Juegos de Guadalupe, GRH and LVDHM to serve as Collateral. This Agreement shall be governed under Mexican Law.

"*Transaction Documents*" refers to this agreement, the Depository Agreement, the Partnership Purchase Agreement, and the Operational Agreement.

"*Total Cash Banking*" means all gross revenue received by Juegos de Guadalupe per location per day, including all receipts, revenues, and rents from casino assets, including, without limitation, from (1) casino operations (including from gaming, food and beverage operations and other concessions), (2) the lease or sublease of space or equipment constituting casino assets, (3) the disposition of, or insurance proceeds relating to, all or any portion of any Casino assets, and (4) any other activities carried on within the Casino operations.

2. **Grant of Security Interest.** To secure the payment and performance in full of the Cash Flow Participation, Mexican Counterparts hereby grants to LVDHM a security interest in, and pledges and assigns to LVDHM, twenty-six percent (26%) of the Partnership Interest owned and retained by Arturo Rojas Cardona in Guadalupe Recreational Holdings, LLC (the Collateral).

3. **Revenues Generated by Collateral.** LVDHM will not be entitled to receive revenues or payments generated the Collateral until such time as the Collateral has been transferred to LVDHM.

4. **Legal binding Documents.** Mexican Counterparts agree to elaborate and sign the proper legal binding documents needed by LVDHM under Mexican Law, of which is not limited to but agreed upon the Pledge Agreement (Contrato de Prenda) which is to be signed by GRH, represented by Arturo Rojas Cardona, and by LVDHM, which same shall be registered in the corporate books of Juegos de Guadalupe.

5. **Covenants Concerning Mexican Counterpart's Legal Status and Actions.** Mexican Counterparts covenant with LVDHM as follows: (a) without providing at least thirty (30) days prior written notice to LVDHM, Mexican Counterparts will not change its name, its place of business or, if more than one, chief executive office, or its mailing address or organizational identification number if it has one; (b) Mexican Counterparts will not change its type of organization, jurisdiction of organization or other legal structure, (c) Mexican Counterparts, through Juegos de Guadalupe, shall make all decisions regarding the company in conformance with its bylaws and at the direction of its Board of Directors, which at all times must contain at least one member selected by LVDHM, and (d) Comply with all the applicable requirements, including all amendments thereto and with applicable provisions of Mexican Law. Only in connection with all Agreements executed for Juegos de Guadalupe project.

6. **Covenants Concerning Collateral.** Mexican Counterparts further covenants with LVDHM as follows:

(a) the Collateral, to the extent not delivered to LVDHM, will at all times be kept in sole possession and control of Arturo Rojas Cardona.

(b) Mexican Counterparts will defend all claims and demands of all persons at any time claiming rights in the Collateral adverse to LVDHM.

(c) Mexican Counterparts will not pledge, mortgage or create, or suffer to exist any right of any person in or claim by any person to the Collateral, or any security interest, lien or encumbrance in the Collateral in favor of any person, other than LVDHM.

(d) Mexican Counterparts will not use the Collateral in violation of law or any policy of insurance thereon.

(e) Mexican Counterparts will pay when due all taxes, assessments, governmental charges and levies upon the Collateral or incurred in connection with the use or operation of such Collateral or incurred in connection with this Agreement.

(f) Mexican Counterparts will continue to operate its business in compliance with all applicable provisions of Mexican law.

(g) Mexican Counterparts will not sell or otherwise dispose, or offer to sell or otherwise dispose, of the Collateral.

7. **Default.** Each of the following occurrences will constitute a Default:

(a) A Default will occur hereunder or under any of the Transaction Documents.

(b) Juegos de Guadalupe will fail to transfer to LVDHM its Cash Flow Participation from the Gross Daily Profit at the time and in the manner required by this Agreement or any material breach of Mexican Counterparts that impacts LVD Mexico Holdings, LLC's interest in the Pledged Revenues.

(c) Mexican Counterparts will default in the due observance or performance of any of its other obligations in this Agreement or the Transaction Documents.

(d) The Casino fails to open due to the fault of an action taken by Mexican Counterparts.

8. **Rights and Remedies.** If a Default will have occurred and be continuing, LVDHM shall, without any other notice to or demand upon Mexican Counterparts, have the right

to take possession of the Collateral, and for that purpose LVDHM may, so far as Mexican Counterparts can give authority therefor, cause the transfer of the Collateral to LVD. In addition, Mexican Counterparts waives any and all rights that it may have to a judicial hearing in advance of the enforcement of any of LVDHM's rights and remedies hereunder, including, without limitation, its right following a Default to take immediate possession of the Collateral and to exercise its rights and remedies with respect thereto

9. **Enforcement.** Upon the occurrence of a default or event of default, Mexican Counterparts will notify LVDHM in writing of such default or event of default (a "Default Notice"). The Notification shall be delivered by certified mail or international courier, granting Juegos de Guadalupe a period of 15 days to remedy the cause for default, after that period LVDHM is able to trigger other actions to which are entitled.

10. **LVDHM's Obligations and Duties.** LVDHM will not have any obligation or liability under any contract or agreement due to this Agreement or the receipt by LVDHM of any payment relating to any of the Collateral, nor will LVDHM be obligated in any manner to perform any of the obligations of Mexican Counterparts under or pursuant to any such contract or agreement, to make inquiry as to the nature or sufficiency of any payment received by LVDHM in respect of the Collateral or as to the sufficiency of any performance by any party under any such contract or agreement.

11. **Securities and Deposits.** LVDHM may, following and during the continuance of a Default demand, sue for, collect, or make any settlement or compromise which it deems desirable with respect to the Collateral.

12. **No Duties Owed by LVDHM.** Any powers conferred on LVDHM in this Agreement are solely to protect its interests in the Collateral and will not impose any duty upon it to exercise any such powers. Neither LVDHM nor any of its officers, directors, employees or agents will be responsible to Mexican Counterparts for any act or failure to act.

13. **No Waiver by LVDHM, etc.** LVDHM will not be deemed to have waived any of its rights or remedies in respect of the Cash Flow Participation or the Collateral unless such waiver will be in writing and signed by LVDHM. No delay or omission on the part of LVDHM in exercising any right or remedy will operate as a waiver of such right or remedy or any other right or remedy. A waiver on any one occasion will not be construed as a bar to or waiver of any right or remedy on any future occasion. All rights and remedies of LVDHM with respect to the Cash Flow Participation or the Collateral, whether evidenced hereby or by any other instrument or papers, will be cumulative and may be exercised singularly, alternatively, successively or concurrently at such time or at such times as LVDHM deems expedient. LVDHM shall send written notice by certified mail or international courier of Notice of Default in case of Event of Default and a brief description of such casue. Such notification shall be sent to Juegos de Guadalupe even if LVD determines not to pursue the default at such time.

14. **Suretyship Waivers by Mexican Counterparts.** LVDHM will have no duty as to the protection of the Collateral or any income therefrom, the preservation of rights against prior parties, or the preservation of any rights pertaining thereto. Mexican Counterparts further waives any and all other suretyship defenses.

15. **Use of Collateral to Pay Mexican Counterparts Liabilities.** LVDHM will not be required to use any present or future Cash Flow Participation or Collateral for payment of Mexican Counterparts liabilities. Mexican Counterparts hereby agrees that it will not invoke any law relating to the use of the Cash Flow Participation or Collateral which might cause delay in or impede the enforcement of LVDHM's rights and remedies under this Agreement.

16. **Proceeds of Dispositions; Expenses.** In the even of a default by Mexican Counterparts, Mexican Counterparts will pay to LVDHM on demand any and all expenses, including reasonable attorneys' fees and disbursements, incurred or paid by LVDHM in protecting, preserving or enforcing LVDHM's rights and remedies under the Agreement.

17. **Severability.** This Agreement remains in effect and shall not be nullified by any agreement or transaction between Juegos de Guadalupe and any other entity.

18. **Governing Law.** This Agreement is intended to take effect as a sealed instrument and will be governed by, and construed in accordance with, the laws of Arizona, without regard to its conflicts of law provisions. Mexican Counterparts agrees that any action or claim arising out of, or any dispute in connection with, this Agreement, any rights, remedies, obligations, or duties hereunder, or the performance or enforcement hereof or thereof, may be brought in the courts of Arizona and consents to service of process in any such action being made upon Mexican Counterparts by certified mail or international courier at the address listed in the first paragraph of this Agreement.

19. **Consent to Jurisdiction.**

    (a) Mexican Counterparts hereby consents to the jurisdiction of the Courts of the State of Arizona.

    (b) LVDHM will be entitled to seek and may seek a deficiency judgment against Mexican Counterparts from and after the date Mexican Counterparts commits any act of fraud in connection with LVDHM, but only upon final determination of such matter by a court of competent jurisdiction.

20. **Miscellaneous.** The headings of each section of this Agreement are for convenience only and will not define or limit the provisions thereof. This Agreement and all rights and obligations hereunder will be binding upon Mexican Counterparts and its respective successors and assigns, and will inure to the benefit of LVDHM and its successors and assigns. If any term of this Agreement will be held to be invalid, illegal or unenforceable, the validity of all other terms hereof will in no way be affected thereby, and this Agreement will be construed and be enforceable as if such invalid, illegal or unenforceable term had not been included in this document. By their signatures, all parties acknowledge receipt of a copy of this Agreement. LVD acknowledges that there may be a one time consulting fee to be paid to ATLICO, which has been included in the total share purchase price of US$6,250,000.00

21. **Notices.** All notices, requests and other communications to any party hereunder will be in writing (including electronic transmission facsimile transmission or similar writing) and will be given to each party at its addresses or facsimile numbers set forth on the signature pages hereof.

IN WITNESS WHEREOF, intending to be legally bound, Mexican Counterparts has caused this Agreement to be duly executed as of the date first above written.

Dated as of August 14, 2006.

LVD Holdings Mexico, LLC

By _Henry K Smith_
Name _____
Title _____

Address: P.O. Box 249 Choate Road, Watersmeet, Michigan 49969

Atlantica de Inversiones Corporativas, S.A.

By _____
Name _____
Title _____

Address:

Juegos de Entretenimiento y Video de Guadalupe, S. de R. L. de C. V.

By _____
Name _____
Title _____

Address:

Guadalupe Recreation Holdings, LLC,

By _____
Name _____
Title _____

Address:

Arturo Rojas Cardona

Page 8 of 8